Jason P. Kathman (State Bar No. 24070036)
Megan F. Clontz (State Bar No. 24069703)
Alex S. Anderson (State Bar No. 24138084)
**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email: jkathman@spencerfane.com
Email: mclontz@spencerfane.com
Email: alanderson@spencerfane.com

*Proposed Counsel for the Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **Vision2Systems LLC** | § | **Case No. 25-40583-MXM-11** |
| | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **Vision2Systems LLC** | § | |
| | § | |
| Plaintiff, | § | **Adversary No. _____** |
| | § | |
| v. | § | |
| | § | |
| | § | |
| **Those Parties Listed in Appendices A and B** | § | |
| | § | |
| | § | |
| Defendants. | § | |

**ADVERSARY COMPLAINT SEEKING (I)(A) A DECLARATORY JUDGMENT THAT THE AUTOMATIC STAY APPLIES TO CERTAIN CLAIMS AND CAUSES OF ACTION ASSERTED AGAINST CERTAIN NON-DEBTORS AND (B) AN EXTENSION OF THE AUTOMATIC STAY TO CERTAIN NON-DEBTORS, OR IN THE ALTERNATIVE, (II) PRELIMINARY INJUNCTION RELATED TO SUCH ACTIONS**

Plaintiff Vision2Systems LLC, a Texas limited liability company and the debtor in the

above-captioned chapter 11 case (the "**Debtor**" or "**V2S**"), hereby filed this Complaint against the

parties listed on **Appendix A** and **Appendix B** to this Complaint (collectively, the "**Defendants**"

or the "**Claimants**"), and alleges as follows:

## Brief Statement of the Case

1.       The Debtor commenced this chapter 11 case (the "**Chapter 11 Case**") to maximize

value to its estate and equitably and transparently resolve claims in favor of the Debtor, its

customers, and also claims against the Debtor. The relief sought through this adversary proceeding

is critical to the Debtor's ability to achieve that purpose. Without the requested declaration or

injunction, the Defendants may be permitted to litigate claims (a) against non-Debtors that have

been, or will be, asserted against the Debtor in the Chapter 11 Case, and (b) that belong to the

Debtor's estate to the detriment of its creditor body as a whole. Such actions will produce

inequitable results, allowing some creditors to win the proverbial "race to the courthouse" and

disadvantaging all other creditors.

2.       As such, the Debtor sees the following:

A.       declarations that 11 U.S.C. § 362(a):

i.       prohibits any act by the Defendants to assert fraudulent transfer,
alter ego, veil piercing, successor liability, or similar claims
(collectively the "**POE Claims**") against the Non-Debtor Affiliates;
and

ii.       prohibits the commencement or continuation of any action by the
Defendants to recover prepetition claims against Carl Tierney and/or
Paul Baldwin (collectively, the "**Non-Debtor Affiliates**") related to
liabilities of the Debtor or related to claims against the Debtor (the
"**Related Claims**").

B.       an extension of the automatic stay under 11 U.S.C. § 105(a) and/or 362(a)
to prohibit the commencement or continuation of any action by the
Defendants against the Non-Debtor Affiliates.

3.       In the alternative to the relief requested in paragraphs A and B, the Debtor seeks a

preliminary injunction under 11 U.S.C. § 105(a) and rule 7065 of the Federal Rules of Bankruptcy

Procedure to enjoin the Defendants' prosecution of the Related Claims and POE (collectively, the "**Claims**") against the Non-Debtor Affiliates unless and until a chapter 11 plan is confirmed in this chapter 11 case, or this chapter 11 case is converted or dismissed.

## Parties

4.      The Plaintiff is the above-captioned debtor and debtor-in-possession. The Debtor is a corporation organized under the laws of Texas and may be served with pleadings in this adversary proceeding by serving the under-signed counsel.

5.      Each of the Defendants named in **Appendix A** is a plaintiff in a pending lawsuit against the Debtor and/or one or more of the Non-Debtor Parties to recover on account of Related Claims or POE Claims.

6.       Each of the Defendants named in **Appendix B** is a customer or former customer of the Debtor that may have or assert claims against the Non-Debtor Parties to recover on account of Related Claims or POE Claims.

## Jurisdiction and Venue

7.      This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). In accordance with Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtor consents to the entry of final orders or a final judgment by this Court in this adversary proceeding.

8.      Venue is proper in this District under 28 U.S.C. § 1409.

9.      The bases for the relief requested herein are Bankruptcy Code sections 105(a) and 362, and Bankruptcy Rules 7001, 7003, and 7065.

**Factual and Procedural Background**

**A.    ACH, ICL, and Card Transactions**

  *i.    ACH Transactions*

  10.    An ACH transaction is an electronic money transfer made between banks and credit unions across a network called the Automated Clearing House (ACH).[1] In 2024, there were more than 33.56 billion ACH transactions, leading to over $86.2 trillion transferred.[2] Formed in 1974, the Automated Clearing House is run by the National Automated Clearing House Association (NACHA).[3]

  11.    There are two types of ACH transactions—ACH debit ("pull") and credit ("push").[4] ACH credit transactions involve an individual or entity "pushing" money to another individual or entity; for example, an organization "pushing" money to its employees for payroll. In an ACH debit transaction, an individual or entity "pulls" money from another individual or entity; for example, an organization may "pull" money from a customer's account for an automatic bill payment. Importantly, although one party's credit is another's debit, the naming convention applies to which party originated the request.

  12.    ACH transfers work by using the ACH network to facilitate the transfer of money from one bank to another. "The ACH Network acts as a financial postal system." [5] Individual transaction instructions can be thought of as letters that the ACH operators sort and deliver between various banks, where each bank acts as a post office on behalf of their respective account holders.

---

[1] *See* https://www.consumerfinance.gov/ask-cfpb/what-is-an-ach-transaction-en-1065/.
[2] *See* https://www.nacha.org/content/ach-network-volume-and-value-statistics
[3] *See* https://www.nacha.org/content/about-us.
[4] *Id.*
[5] https://plaid.com/resources/ach/what-is-ach/

The ACH network currently utilizes two operators: (a) the Electronic Payments Network (EPN), run by the The Clearing House (a collective of 20+ of the largest banks),[6] and (b) FedACH, run by the Federal Reserve Banks.[7] Multiple times a day, member institutions and their processing partners pass ACH messages to the network's operators in the form of specially-formatted digital batches, which the operators rebundle by the recipient bank and pass on at regular intervals during each business day. Each of these bundles contains a structured set of messages instructing the receiving party to make a credit or debit to an account they control.[8]

13.    More specifically, the ACH payment processing involves at least four distinct steps (and potentially a fifth):

- **Payment is initiated:** A person, bank, government agency, or another entity, authorizes the transfer from one bank to the other. As explained above, depending on whether the ACH payment is a credit or debit, the initiator may initiate a "push" or a "pull"

- **ODFI collects information + sends it to the ACH operator:** The Originating Depository Financial Institution (ODFI) gathers information about the transaction and the originator, including routing number, account number, name, and other identifying information.

- **ACH operator verifies + sends file to RDFI**: The ACH Operator verifies information and sends the file to the Receiving Depository Financial Institution (RDFI), which credits or debits the payment from their customer's account

- **Funds clear**: The payment settles and is deposited into the receiving account.

- **Return (if there is a return code)**: Funds can settle before a return comes in, as ACH returns can take up to 60 days to process. If this happens, then the transaction will be reversed.[9]

---

[6] *See* https://www.theclearinghouse.org/about/owner-banks
[7] https://plaid.com/resources/ach/what-is-ach/
[8] *Id.*
[9] https://plaid.com/resources/ach/ach-processing/

**How an ACH Transfer Works**



14.      Although ACH transfers provide a quick and efficient means for transferring funds from one bank to another, they are not without risks. As alluded to above, one potential fifth step exists in processing some ACH transactions—returns. ACH returns occur when an ACH payment cannot be completed, or when the payment initially settles but is rejected later. ACH returns can happen for any number of reasons including insufficient funds, incorrect account information, fraud, errors, or if the account owner asks their bank to place a stop payment on the transfer. These types of returns become particularly problematic when the entity collecting a payment "fronts" or gives credit to the end user before the ACH transaction settles.[10]

---

[10] https://plaid.com/resources/ach/ach-return/

*ii.    ICL Transactions*

15.      An Image Cash Letter (ICL) is a digital file used in the banking industry to facilitate electronic check processing.[11] ICLs are like a virtual package that contains high-quality images of paper checks along with important payment information like account numbers, amounts, and bank routing number details.[12] The introduction of ICLs became more widespread after the passage of the Check Clearing for the 21st Century Act (the "**Check 21 Act**") in 2004. The Check 21 Act allowed banks to process checks based on digital images rather than requiring the original paper documents.

**How an ICL Works[13]**

16.      An ICL Transaction has the following steps:

- **Check Capture and Data Extraction**: When a deposit of a check is made at a bank or through a mobile app, the bank creates a digital image of the check. The digital image includes both the front and back of the check, ensuring all critical details – like signatures and endorsements – are captured. Along with the image, the bank's system extracts important payment information, such as: (1) check number, (2) account and routing numbers, and (3) dollar amount of the check.

- **ICL File Creation**: The digital images and extracted data are compiled into an ICL letter file. This file follow a specific format outlined by industry standards, such as those set by the Federal Reserve or clearinghouses.

- **Transmission to Clearinghouse**: The bank sends the ICL to a clearinghouse or directly to the paying bank. A clearinghouse acts as an intermediary, helping banks settle transactions.

- **Verification and Settlement**: The receiving bank verifies the details in the ICL to ensure the check is legitimate and funds are available. Once verified, the banks settle the transaction by transferring funds between accounts.

- **Archiving**: Both the originating and receiving banks archive the ICL for record-keeping and potential dispute resolution.

---

[11] https://www.echeckplan.com/what-is-an-image-cash-letter-icl-and-how-does-it-work/
[12] *Id.*
[13] *Id.*

*iii.*    *Card Transactions*

17.    Credit card processing occurs when electronic transactions involving credit cards are authorized, authenticated, and settled between the cardholder, the business, and their respective financial institutions.[14] This process allows businesses to accept credit card payments for goods or services, facilitating easy and convenient transactions for both the business and customer.

**How Credit Card Transactions Work**



18.    Some organizations, based on their volume of American Express transactions, can qualify for the High Value American Express program in which they can receive preferential

---

[14] https://stripe.com/resources/more/how-credit-card-transaction-processing-works-a-quick-guide#:~:text=The%20credit%20card%20processor%2C%20also,on%20behalf%20of%20the%20business.

pricing and treatment from American Express. These merchants have a separate agreement directly with American Express in which they receive their settlement directly from American Express versus the Acquiring Bank.

**B.    The Debtor and its Operations.**

19.    The Debtor was formed in connection with Saddleback Valley Community Church ("**Saddleback**") to assist churches enable a ministry-first approach to stewardship and generosity. Working with partner churches, the Debtor developed a product that provided churches with a comprehensive giving and people management solution that provided simplified reporting on a congregation's giving.

20.    The Debtor's product seamlessly integrated with its customer church's websites and allowed the churches to engage givers with a media-rich giving experience. More specifically, rather than focus on Old Testament dictates to tithe to the church, the Debtor's product helped churches elevate and highlight the ministries that were being funded by their congregations and then provide feedback on how campaigns and projects were being funded.

21.    The payment facilitation aspect of the Debtor's product was based upon the Debtor utilizing credit card transactions, ACH debits (to "pull" from the church member's accounts for their contribution), ACH Back Office Conversion transactions for individual checks that could be truncated, and ICL transactions for checks that could not be truncated. Funds were transmitted to church customers via ACH Credit transactions or Wire Transfers.

22.    Red River Systems, a third-party systems integrator, was charged with the original construction of all of the banking integration with the Debtor's initial banking institution, Wells Fargo, for Card, ACH and ICL processing. Red River Systems was responsible for the design of how transactions were transmitted, confirmed, and returned.

23.    To allow the Debtor to facilitate payments and transfers more quickly to their customer churches, the Debtor utilized a "margin account" that allowed it to get immediate credit (prior to the ACH, ICL, or Credit Card transactions clearing) for the payments made by the churchs' members. While utilization of the margin account had the advantage or providing more immediate funds, the Debtor would later learn that the margin account would cover-up situations where transactions were reversed and money initially transferred to the Debtor's account, was subsequently withdrawn from its account in the clearance process. To complicate matters, there were a number of instances where Wells Fargo failed to send the required error files in a format requested and expected so there was no clear communication that the withdrawal had occurred or the reason for the reversal and withdrawal.

24.    In August 2022, Wells Fargo informed the Debtor that they were getting out of the processing business, and that the Debtor would have to change to another processor. Over the next twelve months, the Debtor began reworking its software and integrations with a new processor. In October 2023, shortly after the transition to its new processor, the Debtor encountered a two-week period where, due to the new integrations, it could not facilitate ICL transactions. As a result of the inability to facilitate ICL transactions (i.e., accept and remit check payments made by the Church's members) during that two-week period, several churches left the Debtor's platform and began handling the facilitation of their own transactions without the Debtor's product. It was during this period, for the first time, the Debtor began to recognize cash-flow shortfalls in settling transactions with its customer churches. The cash flow concerns lead to longer delays in settling transactions with customer churches, which in-turn lead to additional churches leaving the platform and further exasperation of the cash flow problems.

25.     It was also during this time, through investigation and review of bank data files, the Debtor learned that for years it had essentially been over-settling transactions to many of its member churches. Due to the margin account, the Debtor would receive the funds from ACH, ICL and Credit Card transaction immediately, and then immediately push the funds to the customer churches. However, when transactions pulled by the Debtor were later reversed because of any number of error codes, and the funds withdrawn from the Debtor's account, the funds had already been transferred and credited to the customer churches. The result? Many churches received funds that their members never paid. The Debtor's incredibly rapid growth and profits covered-up the issue for years, until churches began leaving in October 2023. By this time though, the Debtor had been over-settling and transferring to 100s of churches for close to a decade.

26.     Further complicating the problem, the Debtor has since learned that, while most of the Debtor's credit card processors would deposit the *gross* amount of the credit card transactions (*i.e.,* the amount charged to the church member's card) and later charge the fees for the transaction to the Debtor, the High Value American Express Program was likely depositing the *net* amount of the credit card transactions (*i.e.*, the amount charged to the church member minus the fees for the transaction). Because the majority of the Debtor's credit card processors settled gross, the Debtor withheld the fees from the settlement to its member churches. However, because the fees had already been withheld by American Express on those transactions, the Debtor's withholding of those amounts from church's settlement lead to further complications in the accounting.

C.     **The Prepetition Lawsuits**

27.     As of the Petition Date, there were at least four main lawsuits pending against the Debtor and the Non-Debtor Affiliates.

      i.       *Saddleback Valley Community Church v. Vision2Systems, LLC, et. al.*, Case No. 3:24-cv-02700, pending in the United States District Court for the Northern District of Texas.

28.    On or about October 28, 2024, Saddleback sued the Debtor and each of the Non-Debtor Affiliates in the United States District Court for the Northern District of Texas, initiating Case No. 3:24-cv-02700 (the "**Saddleback Litigation**"). Saddleback is one of the Debtor's oldest customers and also one of the Debtor's largest customers. In its lawsuit, Saddleback alleges *inter alia* that the Debtor and each of the Non-Debtor Affiliates breached the contract to Saddleback (though the Non-Debtor Affiliates are not parties to the contract, that the Debtor and Non-Debtor Affiliates breached their fiduciary duties to Saddleback, that the Debtor and Non-Debtor Affiliates (no distinction made between them) committed fraud and fraud in inducement, and that "there is a unity between Vision2 and one or both of the individual Defendants that the separateness of the corporation has ceased, and the corporate veil should be pierced to find the individual Defendants personally liable for the acts of Vision2."[15]

      ii.     *The Crossing Church v. Vision2Systems, LLC, et. al*, Cause No. DC-24-18092, pending in the 116th Judicial District Court for Dallas County, Texas.

29.    On October 14, 2024, The Crossing Church ("**Crossing Church**") sued the Debtor and each of the Non-Debtor Affiliates in the 116th District Court for Dallas County, Texas, initiating Cause No. DC-24-18092 (the "**Crossing Church Litigation**"). The Crossing Church alleges *inter alia* breach of contract, breach of fiduciary duty, negligence and gross negligence, money had and received and unjust enrichment. Two weeks after the petition was filed, Northridge Church filed its Original Petition in Intervention and Application for Injunction, and requesting a prejudgment garnishment. In its Original Petition in Intervention, Northridge Church also named each of the Non-Debtor Affiliates as parties.

---

[15] *See* Original Complaint at ¶ 92.

       iii.    *Resurrection Metropolitan Community Church v. Vision2Systems, LLC, et. al,* Cause No. 2024-69700, pending in the 234th District Court for Harris County, Texas.

30.    On October 8, 2024, Resurrection Metropolitan Community Church ("**Resurrection Church**") sued the Debtors and both of the Non-Debtor Affiliates in the 234th District Court for Harris County, Texas, initiating Cause No. 2024-69700 (the "**Resurrection Church Litigation**"). Resurrection Church alleges claims for *inter alia*: breach of contract against all of the Defendants (even though the Non-Debtor Affiliates are not parties to the contract), suit for an accounting, unjust enrichment, quantum meruit, fraud and fraudulent inducement, DTPA violations, and conspiracy.

       iv.    *Christian Fellowship Church v. Vision2Systems, LLC, et. al*, Cause No. DC-25-00011, pending in the 68th District Court of Dallas County, Texas.

31.    On or about January 2, 2025, Christian Fellowship Church ("**Christian Fellowship Church**") filed its Verified Original Petition, Application for Temporary Restraining Order, Application for Temporary Injunction and Application for Permanent Injunction in the 68th District Court for Dallas County, Texas, initiating Case No. DC-25-00011 (the "**Christian Fellowship Church Litigation**"). Christian Fellowship Church alleges claims against the Debtor and each of the Non-Debtor Affiliates for *inter alia*: breach of contract, breach of fiduciary duty, negligence/gross negligence, money had and receiver and unjust enrichment, fraud and fraud in the inducement, civil conversion, Texas Theft Liability Act, Texas DTPA, and Conspiracy against each of the defendants named therein, including the Debtor and both of the Non-Debtor Affiliates.

**D.    The Bankruptcy**

32.    On February 19, 2025 (the "**Petition Date**"), the Debtor filed it voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code.[16] The purpose of the Debtor's bankruptcy is to (1) provide a central forum for the resolution of all claims in favor of, and against the Debtor, and (2) provide central forum and mechanism for the disposition of requested data. The Debtor anticipates that in each of the cases that were pending prior to the Petition Date, and in the resolution of the claims of each of the various churches, creditors and the churches will want access to the highly sensitive and confidential data that underlies the reconciliation of the amounts owed. Rather than enter into multiple different confidentiality and non-disclosure agreements that may have inconsistent and varying terms, filed contemporaneously herewith, the Debtor is filing its its *Emergency Motion for Confidential and Protective Order,* that seeks a protocol and process for customers and creditors to obtain the information necessary for them to reconcile their claims.

<u>Causes of Actions</u>

**Count I: Declaratory Judgment Pursuant to
28 U.S.C. § 2201(a) that 11 U.S.C. § 362(a)(10 and (a)(3)
<u>Apply to Defendant Asserting Related Claims and POE Claims</u>**

33.    The Debtor repeats and realleges the allegations in paragraphs 1 - 32 as though fully set forth herein.

34.    Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).   The continuation or commencement of claims against the Non-Debtor

---

[16] 11 U.S.C. §§ 101 *et. seq.*

Affiliates, which are unequivocally efforts to recover on claims against the Debtor, are automatically stayed. Each of the claims against the Non-Debtor Affiliates inextricably rely upon the Debtor's alleged prepetition acts. Thus, the prosecution of the claims alleged in the Prepetition Litigation against the Non-Debtor Affiliates can only have one purpose and effect: the ultimate liquidation and recovery of claims against the Debtor. Accordingly, the claims against the Non-Debtor Affiliates are expressly enjoined by the automatic stay.

35.    Similarly, "[a]ny action to obtain possession of property from the estate or to exercise control over property of the estate" is automatically stayed under section 362(a)(3). 11 U.S.C. § 362(a)(3). The POE Claims consist of alter ego/veil piercing and/or similar claims. Each such claim is property of the Debtor's estate, is subject to the automatic stay, and is under the Debtor's exclusive control. *See* 11 U.S.C. § 541(a); *In re S.I. Acquisition, Inc.*, 817 F.2d at 1150–53; *Schimmelpenninck v. Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 365–66 (5th Cir. 1999); *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983); *In re Educators Grp. Health Tr.)* 25 F.3d at 1284–86; *In re Moore*, 608 F.3d at 261.

36.    Furthermore, 28 U.S.C. § 2201(a) provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Courts have jurisdiction to issue declaratory relief when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v.*

*Genentech, Inc.*, 549 U.S. 118, 127 (2007); *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294–95 (5th Cir. 2019).

37.     There is a substantial controversy between the Debtor and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Without the resolution of this controversy, the Debtor expects that the Defendants will continue to assert the claims they have and the POE Claims against the Non-Debtor Affiliates.  Continued prosecution of the claims and POE Claims against the Non-Debtor Affiliates will allow the liquidation of prepetition claims against the Debtor outside of this chapter 11 case, and otherwise permit non-Debtors to exercise control over property of the estate in contravention of the automatic stay.

38.     Accordingly, the relief requested in this Complaint is necessary and appropriate to protect the integrity of the automatic stay, and the Debtor's chapter 11 case and prevent the dissolution of the Debtor's estate to the detriment of the Debtor's creditors as a whole.

## Count II: Preliminary Injunctive Relief
## Under Sections 105 and 363 of the Bankruptcy Code

39.     The Debtor repeats and realleges the allegations in paragraphs 1– 38 as though fully set forth herein.

40.     Section 105(a) of the Bankruptcy Code permits the bankruptcy court to issue any order "necessary or appropriate" to assure the administration of the Debtor's bankruptcy estate, including issuing injunctions to enjoin actions against to non-debtors.  *See* 11 U.S.C. § 105(a); *Villarreal v. N.Y. Marine & Gen. Ins. Co. (In re OGA Charters, LLC)*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016).  An injunction here is warranted to prohibit the Defendants from prosecuting Claims against the Non-Debtor Affiliates while the Debtor is working to formulate and confirm a chapter 11 plan.

41.     When implementing a temporary injunction to stay actions against non-debtors, courts consider four factors:  (1) if the movant is "likely to succeed on the merits"; (2) if the movant is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) if the balance of equities tips in the movant's favor; and (4) whether granting the injunction "is in the public interest."  *In re OGA Charters, LLC*, 554 B.R. at 424 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

42.     Here, the Debtor meets each of the four requirements for a preliminary injunction. As to the first factor, for the reasons discussed above in Count I (¶¶ 33 - 38), the Debtor is likely to demonstrate that the automatic stay already applies, or should be extended to apply, to the claims pursuant to applicable law.  Furthermore, the Debtor's prospect for confirming a chapter 11 is strong, and an injunction will enhance the prospects of doing so. The Debtor is acting in good faith in an effort to fully, equitably, and efficiently resolve claims through the establishment of a trust in a chapter 11 plan.

43.     As to the second factor, an injunction is necessary to prevent irreparable harm to the Debtor and its estate for five reasons.  *First*, absent the requested injunction, the prosecution of the claims being asserted in the pending cases would result in losses to the Debtor's estate and, in turn, the Debtor's creditors as a whole.  The exact same claims that exist against the Debtor in its chapter 11 case would be prosecuted through piecemeal litigation against the Non-Debtor Affiliates outside of this Court.  Indeed, certain of the Defendants have contended that the Debtor and the Non-Debtor Affiliates are a single entity and allege the same injuries using the same evidence in support of their claims under successor liability, alter ego, and joint and several liability theories. *See Saddleback Valley Community Church v. Vision2Systems, LLC et. al*, Case No. 3:24-cv-02700, Docket No. 1 (N.D. Tex. Oct. 28, 24)("there is such unity between Vision2 and one or

both of the individual Defendants that the separateness of the corporation has ceased, and the corporate veil should be pierced to find the individual Defendants personally liable for the acts of Vision2."); *see also Christian Fellowship Church v. Vision2Systems, LLC*, Case No. DC-25-00011 (68th District Court Dallas, County, Texas)("it is the contention of Plaintiff Christian Fellowship Church that…such parties are/were "alter egos" of the parties named herein. Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice."). Accordingly, prosecution of those claims would result in the liquidation of claims against the Debtor. Further, litigation of those claims will also likely lead to discovery burdens on the Debtor and would certainly harm the Debtor's ability to confirm a chapter 11 plan that maximizes recovery and provides equitable treatment to the Debtor's creditors. *See id*; *see also, e.g., In re ACIS Cap. Mgmt., L.P.*, No. 18-03212-SGJ, Docket No. 21 (Bankr. N.D. Tex. Jul. 10, 2018) (granting injunction and finding that "[i]njunctive relief is necessary here to prevent imminent and irreparable injury in the form of substantial losses to creditors and parties-in-interest"); *In re LTL Mgmt., LLC*, 638 B.R. 291, 307 (Bankr. D.N.J. 2022) (finding that an extension of the automatic stay to non-debtors was warranted where "continued litigation against the [p]rotected [p]arties would divert funds and resources toward defense costs and potentially disrupt the flow of funds and resources" towards debtor's estates).

44.    *Second*, permitting non-Debtors to assert the POE Claims—aside from violating the stay, as discussed above—will otherwise allow certain Defendants to benefit from causes of action at the expense of the Debtor's other creditors. It is the Debtor who owns the POE Claims and should therefore exercise control over the same—which constitute its estate property—to garner value for its estate and its creditors as a whole, not third parties.

45.     *Third*, continued prosecution of the Claims would distract the Debtor's professionals and redirect time and resources away from the Debtor's efforts in its chapter 11 case, thereby potentially threatening the Debtor's ability to swiftly and efficiently resolve this chapter 11 case.  *See e.g.*, *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (enjoining non-debtors from continuing lawsuit "[b]ecause the suit would ultimately divert the debtor's resources and attention from the bankruptcy process.").

46.     *Fourth*, the resolution of Claims and issues in litigation against the Non-Debtor Affiliates could bind the Debtor under various preclusion doctrines such as collateral estoppel and *res judicata*.  To avoid this risk, the Debtor would be compelled to actively participate in each of the pending state and federal lawsuit to ensure that the Debtor's interests are adequately protected. This would undermine the automatic stay and consume all of the Debtor's time and resources.

47.     *Finally*, for the foregoing reasons, prosecution of the claims against the Non-Debtor Affiliates would frustrate the purpose of the automatic stay—to provide debtors with a "breathing spell" to allow them to focus on the bankruptcy proceeding.  *See e.g.*, *Commonwealth Oil Refining Co. v. EPA (In re Commonwealth Oil Ref. Co.)*, 805 F.2d 1175, 1182 (5th Cir. 1986). Failure to issue an injunction could result in inconsistent results among tribunals which will likely, in turn, lead to differing recoveries among similarly situated claimants.

48.     In contrast to the immediate and irreparable harm the Debtor and its estate would face if injunctive relief were denied, the only potential harm faced by the Defendants is delay. Mere delay as a result of an injunction issued until bankruptcy proceedings are resolved is not a significant harm.  *In re Lazarus Burnam Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993). Furthermore, as mentioned above, the Debtor's creditors, as a whole, are benefitted by the injunction requested in this Complaint. Thus, the balance of equities weighs in the Debtor's favor.

As to the fourth factor, public interest favors an injunction, which would enable the Debtor to maximize the value of its estate, focus on confirming a chapter 11 plan, and make every effort to ensure the most equitable and meaningful return possible to creditors.  This result is not feasible if piecemeal litigation of the claims outside of this Court circumvents the bankruptcy process.

49.    Accordingly, an injunction barring the Defendants from prosecuting the claims against the Non-Debtor Affiliates until the earlier of (a) the confirmation of a chapter 11 plan, or (b)(i) conversion or (ii) dismissal of the Debtor's chapter 11 case is appropriate and essential to the orderly and effective administration of the Debtor's estate.

### Prayer for Relief

WHEREFORE, the Debtor respectfully requests that this Court grant the following relief:

a.    declare that 11 U.S.C. § 362(a) prohibits any act by the Defendants to assert POE Claims against the Non-Debtor Affiliates;

b.    declare that 11 U.S.C. § 362(a) prohibits the commencement or continuation of any action or proceedings by the Defendants to recover on Related Claims against the Non-Debtor Affiliates;

c.    extend the automatic stay under 11 U.S.C. § 105(a) and/or 362(a) to prohibit the commencement or continuation of any action by the Defendants against the Non-Debtor Affiliates;

d.    in the alternative, issue a preliminary injunction under 11 U.S.C. ¶ 105(a) and rule 7065 of the Federal Rules of Bankruptcy Procedure to enjoin the Defendants' prosecution of claims against the Non-Debtor Affiliates unless and until a chapter 11 plan is confirmed in this chapter 11 case, or this chapter 11 case is converted or dismissed; and

e.    award all such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 19th day of February, 2025

/s/ Jason P. Kathman
Jason P. Kathman
State Bar No. 24070036
Megan F. Clontz
State Bar No. 24069703
Alex S. Anderson
State Bar No. 24138084
**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Telecopier
Email: jkathman@spencerfane.com
Email: mclontz@spencerfane.com
Email: alanderson@spencerfane.com

***PROPOSED COUNSEL***
***FOR PLAINTIFF***